## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

UNITED STATES OF AMERICA

v.                                              CRIMINAL ACTION NO. 5:24-cr-00013

KEVIN LEMAR LEGRAND

### MEMORANDUM OPINION AND ORDER

Pending is Defendant Kevin Legrand's objection to the draft Presentence Investigation Report ("Report" or "PSR"). Mr. Legrand was scheduled for sentencing on October 4, 2024. [ECF 52]. The parties were directed to file cross-briefs respecting whether Mr. Legrand was entitled to a two-level downward adjustment under the statutory Safety Valve, 18 U.S.C. § 3553(f), and corresponding United States Sentencing Guidelines provision, U.S.S.G. § 2D1.1(b)(18). [ECF 52]. The parties filed their briefs on October 21, 2024. [ECF 53, 54]. Mr. Legrand responded to the Government's brief on October 28, 2024. [ECF 55]. On January 16, 2025, the Court entered an order directing the parties to address the percolating circuit split regarding the interpretation of the word "offense" as used in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2(a)(2). [ECF 61]. Mr. Legrand filed an opening brief January 30, 2025. [ECF 62]. The Government responded February 18, 2025. [ECF 64]. Mr. Legrand replied February 20, 2025. [ECF 66].

### I.

On February 16, 2023, Mr. Legrand distributed 7.2 grams of fentanyl to a CI while both were in Mr. Legrand's vehicle. [ECF 44]. On February 20 and 27, 2023, respectively, two

more controlled buys occurred at Mr. Legrand's residence. The CI never reported Mr. Legrand possessing a firearm at any of the three transactions.

On March 2, 2023, a search warrant was executed at Mr. Legrand's residence. Officers discovered "$2,505.00 ($120.00 of which was pre-recorded 'buy money'), a tactical shotgun, a .38 caliber handgun, two loaded magazines, multiple digital scales, [a] vacuum sealer, and body armor in the defendant's bedroom." [ECF 53 at 2]. They also found suspected marijuana in various baggies, approximately 25.5 Oxycodone 30 mg prescription pills and tablets, and two cellular devices. Mr. Legrand provided a statement that he was not a felon in possession; he claimed possession of the weapons for protection and insisted he had a right to bear arms.

On June 17, 2024, Mr. Legrand pled guilty to distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1). [ECF 44]. He pled to Count One, which was the distribution offense arising out of the February 16, 2023, transaction in the vehicle. Counts Two and Three, respectively, involve the February 20 and 27, 2023, distribution offenses that occurred at Mr. Legrand's residence. The matter is ready for adjudication.

## II.

### A.    *The Statute, the Guideline, and the Guideline Commentary*

Guideline § 2D1.1(b)(18) grants a two-level reduction if the defendant meets the criteria found in Guideline § 5C1.2(a)(1)–(5). *See* U.S.S.G. § 2D1.1(b)(18). This "safety valve" reduction allows shorter sentences for first-time offenders otherwise facing mandatory minimum sentences. *See United States v. Fletcher*, 74 F.3d 49, 56 (4th Cir. 1996). Guideline § 5C1.2(a) provides as follows:

(a) Except as provided in subsection (b), in the case of an offense under 21 U.S.C. § 841, § 844, § 846, § 960, or § 963, or 46 U.S.C. § 70503 or § 70506, the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, *if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)–18 U.S.C. § 3553(f)(5) as follows*:

> (1) the defendant does not have—
>
> > (A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
> >
> > (B) a prior 3-point offense, as determined under the sentencing guidelines; and
> >
> > (C) a prior 2-point violent offense, as determined under the sentencing guidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and
>
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

U.S.S.G. § 5C1.2(a)(1)-(5) (emphasis added).

Guideline § 5C1.2 is unlike any other Guideline. It is derived in its entirety from the statute cited and quoted therein, namely, 18 U.S.C. § 3553(f). Indeed, as indicated in the

emphasized portion above, the reduction applies only "if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)–18 U.S.C. § 3553(f)(5) *as follows*[:]"

> (1) the defendant does not have--
>
>> (A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
>>
>> (B) a prior 3-point offense, as determined under the sentencing guidelines; and
>>
>> (C) a prior 2-point violent offense, as determined under the sentencing guidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and
>
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f)(1)-(5) (emphasis added).  Again, aside from a citation-format difference in subdivision (4), § 3553(f) and Guidelines § 5C1.2(a)(1)-(5) are not just identical; instead, the Guideline not only references § 3553(f), but essentially extracts it from the United States Code and imports it wholesale into the Guidelines Manual. Indeed, the first iteration of Guidelines § 5C1.2 used this language: "if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)-(5) *set forth verbatim below* . . . ." *See* U.S.S.G. § 5C1.2, Amend. 509 (U.S. Sent'g

Comm'n Sept. 23, 1994) ("Chapter Five, Part C, is amended by inserting an additional guideline with accompanying commentary as §5C1.2 . . . .").

Finally, the Commission not only sourced the material portion of § 3553(f) wholesale, but also then added in the new Guideline § 5C1.2 commentary ascribing a new, particular meaning to the word "offense" as follows: "'[o]ffense,' as used in subdivisions (2)-(4), and 'offense or offenses that were part of the same course of conduct or of a common scheme or plan,' as used in subdivision (5)" include the offense of conviction and all relevant conduct. U.S.S.G. § 5C1.2, comment., (n.1.C) (emphasis added).

## B.     The Case for the Commission Overstepping in Defining "Offense"

In sum, then, the Commission quoted the statutory text of § 3553(f), defined for Congress the term "offense" as it appears in the statute, and, perhaps most extraordinary, surfaced that definition not in the Guideline text but, instead, in the commentary to Guideline § 5C1.2. That last point is particularly concerning inasmuch as some courts have suggested there are different congressional review methods for proposed guidelines as opposed to commission commentary. *Compare*, *e.g.*, *United States v. Campbell*, 22 F.4th 438, 446 (4th Cir. 2022) ("[I]n fashioning commentary the Commission acts unilaterally, without that continuing congressional role so vital to the Sentencing Guidelines' constitutionality."), *with United States v. Moses*, 23 F.4th 347, 353 (4th Cir. 2022) ("Thus, the Commission, in practice, generally follows the same process for adopting and amending policy statements and commentary as it uses for the promulgation and amendment of the Guidelines themselves.").

One critical of the Commission's approach from a philosophical, separation-of-powers standpoint might have a more granular, textual and legislative history analysis as traction, at least at first blush. The rationale is a bit complex.

The word "offense" found its way into § 3553 -- which at that point did not include a subdivision (f) -- in 1984. And Congress left the term undefined not only in § 3553, but throughout the monumental measure known as the Comprehensive Crime Control Act of 1984. Pub. L. 98–473, 98 Stat. 1976 (Oct. 12, 1984) ("1984 CCCA"). The word "offense" appears hundreds of times throughout the 1984 CCCA, including within § 3553 and § 3579/3663 (the relevance of which will soon become apparent). It appears four times alone in § 3553.

Additionally, the 1984 CCCA was perhaps one of the most reticulate, long studied, and debated statutory schemes of the last 50 years. *See* Rachel E. Barkow, *Categorical Mistakes: The Flawed Framework of the Armed Career Criminal Act and Mandatory Minimum Sentencing*, 133 Harv. L. Rev. 200, 210 (2019) (referring to the 1984 CCCA as one of "'the most significant series of changes in the federal criminal justice system ever enacted at one time.'") (quoting Joseph E. diGenova & Constance L. Belfiore, *An Overview of the Comprehensive Crime Control Act of 1984 -- The Prosecutor's Perspective*, 22 Am. Crim. L. Rev. 707, 707 (1985)); *see also* S. Rep. 98-225, at 1, as *reprinted in* 1984 U.S.C.C.A.N. 3182, 3184 ("The Comprehensive Crime Control Act . . . is the product of a decade long bipartisan effort of the Senate Committee on the Judiciary, with the cooperation and support of successive administrations, to make major comprehensive improvements to the federal criminal laws. Significant parts of the measure . . . have evolved over the almost two-decade consideration of proposals to enact a modern federal criminal code.").

Additionally, the Supreme Court and our Court of Appeals have weighed in decisively on the text. For example, at least as to United States Code § 3579/3663, which appears

6

in the same chapter as § 3553, both Courts long ago observed as to the former, "[A] straight-forward reading of the provisions indicates that the referent of . . . 'an offense' is *the offense of conviction*." *Hughey v. United States*, 495 U.S. 411, 416 (1990) (emphasis added) (interpreting 18 U.S.C. § 3579, recodified as 18 U.S.C. § 3663 in the 1984 CCCA)). Relying upon *Hughey* and related authority, our Court of Appeals has far more recently observed likewise as to the word "offense:"

> Indeed, these statutes do not allow restitution for "relevant conduct," "a related offense," or a "factually relevant offense," but rather, "the offense," *which can only be read to mean the offense of conviction. See Hughey*, 495 U.S. at 418, 110 S. Ct. 1979 ("[H]ad Congress intended to permit a victim to recover for losses stemming from all conduct attributable to the defendant, including conduct unrelated to the offense of conviction, Congress would likely have chosen language other than 'the offense,' *which refers without question to the offense of conviction*."). *To hold otherwise would be to improperly read the words "of the offense" out of the statute. See United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (declining to adopt a construction that would violate the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect").

*United States v. Freeman*, 741 F.3d 426, 434 (4th Cir. 2014).

The decisions in both *Hughey* and *Freeman* are not only binding but also unquestionably correct from a linguistic and commonsense standpoint. And despite the fact both controlling decisions interpreted the word "offense" in a statute other than § 3553, it is natural for one to read the word "offense" in the same, limited way for both statutes if, for no other reason, that doing otherwise would offend a premier canon of statutory interpretation, namely, the presumption of consistent usage. Of course, the presumption is not inflexible, as noted by the Supreme Court:

> Although we presume that the same term has the same meaning when it occurs here and there in a single statute, the Court of Appeals mischaracterized that presumption as "effectively irrebuttable." We also understand that "[m]ost words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the

7

same statute or even in the same section." Thus, the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning . . . is not rigid *and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent*." A given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.

*Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (emphasis added).

So, without more, there appears no reason to depart from the "natural presumption" here based upon the entirety of the 1984 CCCA. And that conclusion is buttressed, again at least initially, by the legislative history of the Sentencing Reform Act -- a key part of the 1984 CCCA. The Sentencing Reform Act observes at multiple points that, absent express language to the contrary, the term "offense" refers to the offense of conviction and not to broader uncharged or related conduct. *See*, *e.g.*, S. Rep. No. 98-225, at 75–76 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3258–59 (directing courts to consider the "nature and circumstances of the offense" in sentencing, with emphasis on factors tied to *the charged crime*, such as whether a weapon was used or the role of the defendant) (emphasis added). The Senate Report also separately instructs judges to consider a defendant's "history and characteristics," including any prior criminal behavior, confirming that "offense" and broader patterns of criminal conduct are treated as distinct concepts. *See also id.* at 304, 1984 U.S.C.C.A.N. at 3487 (describing sentencing enhancements for offenders engaged in a "pattern of criminal conduct" as separate from the elements of the charged offense).

Furthermore, nowhere does the Senate Report suggest that the term "offense" includes "relevant conduct" or uncharged acts; rather, it consistently uses other terms, such as "criminal history" or "pattern of activity," when addressing conduct beyond the offense of conviction. This structure reflects the ordinary presumption -- consistent with the decisions in

8

*Hughey* and *Freeman* -- that undefined statutory terms are given their ordinary legal meaning, which in the criminal context ties "offense" to the crime adjudicated in the proceeding.

Lest there be any doubt about the confined meaning of the term "offense" after the foregoing analysis, however, it is important to remember that, at the time the 1984 CCCA was enacted, the phrase "relevant conduct" was an as-yet, nonexistent innovation of the Commission, and not explicitly mandated or described by Congress in the 1984 CCCA or its legislative history. So, it would have been impossible at the time § 3553 was first enacted for Congress to contemplate the word "offense" should include that unknown concept. *See*, *e.g.*, Hon. William W. Wilkins Jr & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C. L. Rev. 495, 496 (1990) (Judge Wilkins, Chairman of the Commission in 1990, observed with his co-author as follows: "The guidelines, including amendments, embody a number of *critical policy choices* within the framework of the [Sentencing Reform] Act's extensive guidance and direction. This article focuses on the guideline entitled "Relevant Conduct" *which incorporates several significant Commission decisions*. This guideline forms the cornerstone of the federal sentencing guideline system, and a thorough understanding of it is essential to correct application of the guidelines.") (emphasis added) (footnotes omitted).

The foregoing discussion thus would strongly suggest the Commission reached too far in fashioning its commentary definition of the statutory word "offense." The analysis, however, does not end there. Subsequent developments in Congress steer the inquiry sharply in a different direction.

**C.**    ***The Case for Why the Commission Permissibly and Correctly Defined the Word "Offense"***

The hope of a straightforward, textual answer -- supported, if necessary, by the 1984 CCCA legislative history -- evaporates when one undertakes a similar, deep analysis of what occurred a decade later. The Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103–322, 108 Stat. 1823, § 80001, (codified at 18 U.S.C. § 3553(f)) ("1994 VCCLEA"), was a similar, sprawling crime control and sentencing reform measure that became effective September 13, 1994. It was the 1994 VCCLEA that added subsection (f) to § 3553, specifically in Title VIII, §80001(a) of Public Law 103-322. The brand-new Safety Valve statute provided as follows:

> (f) LIMITATION ON APPLICABILITY OF STATUTORY MINIMUMS IN CERTAIN CASES.—Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846) or section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 961, 963), the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—
>
> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. 848; and
>
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the

defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

Pub.L. No. 103–322, 108 Stat. 1823, § 80001 (codified at 18 U.S.C. § 3553).

The 1994 VCCLEA added five more instances of the word "offense" to the four occurrences of that word already appearing in § 3553 from the 1984 CCCA. More importantly, the session law also included § 80001(b), a rather exceptional *and mandatory* directive to the Commission -- to which the Court has found no reference either in the United States Code nor case law. The unusual provisions states as follows:

(b) Sentencing Commission Authority.-

(1) In general. —(A) The United States Sentencing Commission (referred to in this subsection as the "Commission"), under section 994(a)(1) and (p) of title 28-

(i) shall promulgate guidelines, or amendments to guidelines, to carry out the purposes of this section and the amendment made by this section; and

(ii) may promulgate policy statements, or amendments to policy statements, to assist in the application of this section and that amendment.

(B) In the case of a defendant for whom the statutorily required minimum sentence is 5 years, such guidelines and amendments to guidelines issued under subparagraph (A) shall call for a guideline range in which the lowest term of imprisonment is at least 24 months.

(2) Procedures. —If the Commission determines that it is necessary to do so in order that the amendments made under paragraph (1) may take effect on the effective date of the amendment made by subsection (a), the Commission may promulgate the amendments made under paragraph (1) in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that section had not expired.

Pub.L. No. 103–322, 108 Stat. 1823, § 80001(b).

11

As further analyzed *infra*, this statutory authorization, indeed command, leaves little doubt the Article I Legislature vested the Commission with sweeping authority to implement the important policy concerns underlying the new statutory Safety Valve, undoubtedly extending to interpreting the terms appearing therein, including the definition of "offense." And it appears the Commission heeded the call. In the "Background" section of the then newly minted Guideline § 5C1.2 and accompanying Commentary, it stated as follows:

> Background: This section sets forth the relevant provisions of 18 U.S.C. § 3553(f), as added by section 80001(a) of the Violent Crime Control and Law Enforcement Act of 1994, which limit the applicability of statutory minimum sentences in certain cases. *Under the authority of section 80001(b) of that Act, the Commission has promulgated application notes to provide guidance in the application of 18 U.S.C. § 3553(f).*

U.S.S.G. § 5C1.2, cmt. (U.S. Sent'g Comm'n Sept. 23, 1994) (emphasis added).

A textual analysis thus becomes quite challenging. Indeed, one could make an exceptional case that the word "offense" in the very same statute might be susceptible of two different, but simultaneously compatible, meanings. It is difficult to find a case where the Supreme Court has done so. In *Smith v. United States*, 508 U.S. 223, 244–45 (1993), the majority opinion interpreted the word "use" to have a single meaning ("active employment") throughout 18 U.S.C. § 924(c). The dissenting opinion, authored by Justice Scalia, and joined by Justice Stevens and Justice Souter, appears to have contemplated different definitions of the word "use" and its variants within the same statute:

> The Court seeks to avoid this conclusion by referring to the next subsection of the statute, § 924(d), which does not employ the phrase "uses a firearm," but provides for the confiscation of firearms that are "used in" referenced offenses which include the crimes of transferring, selling, or transporting firearms in interstate commerce. The Court concludes from this that whenever the term appears in this statute, "use" of a firearm must include nonweapon use. I do not agree. We are dealing here not with a technical word or an "artfully defined" legal term, but with common words that are, as I have suggested, inordinately sensitive to context. Just as adding the direct object "a firearm" to the verb "use" narrows the meaning of that verb (it can

12

> no longer mean "partake of"), so also adding the modifier "in the offense of transferring, selling, or transporting firearms" to the phrase "use a firearm" expands the meaning of that phrase (it then includes, as it previously would not, nonweapon use).

*Smith v. United States*, 508 U.S. 223, 244–45 (1993) (Scalia, J., dissenting (with Stevens, J. and Souter, J.)). In other words, the dissent would have attributed to the word "use" a different, narrower meaning depending on the context of the firearm's role, contrasting using it as a weapon with using it as a barter good.

The interpretive difficulty surrounding the word "offense" has, as one might expect, given rise to a split among the United States Courts of Appeal. That matter is discussed in the next section. *See*, *e.g.*, *United States v. Hodgkiss*, 960 F.3d 1110, 1111-1112 (8th Cir. 2020); *United States v. Fitzpatrick*, 67 F.4th 497, 504 (1st Cir. 2023); *United States v. Wilson*, 106 F.3d. 1140, 1145 (3rd Cir. 1997); *United States v. Chen*, 127 F.3d 286, 291 (2nd Cir. 1997); *United States v. Plunkett*, 125 F.3d. 873, 875 (D.C. Cir. 1997).

For example, as noted, Guideline § 5C1.2(a)(2) requires "the defendant did not . . . possess a firearm . . . in connection with the offense." *See* U.S.S.G. § 5C1.2. The United States Court of Appeals for the Eighth Circuit has concluded the word "offense" in 18 U.S.C. § 3553(f)(2) means "offense of conviction," necessarily excluding the broader concept of relevant conduct under the Guidelines. *See United States v. Hodgkiss*, 960 F.3d 1110, 1111-1112 (8th Cir. 2020).

> "the offense" by itself incorporated the concept of "relevant conduct" under the guidelines, then the reference to other "offenses" in § 3553(f)(5) would be superfluous: relevant conduct would already include acts and omissions that were "part of the same course of conduct or common scheme or plan as the offense of conviction." *See* USSG § 1B1.3(a)(2).

*Id*. at 1111. To bolster its position, the Eighth Circuit stated, "where the Commission's commentary conflicts with the plain meaning of a statute, the statute governs." *Id*. (referencing *United States v.*

*Labonte*, 520 U.S. 751, 765 (1997); *Neal v. United States,* 516 U.S. 284, 294-95, (1996)). That observation is facially sensible. It does not, however, withstand close scrutiny.

### D.    *The Deference, if any, to be Accorded to the Commission*

The Commission has benefited from some measure of deference over the decades since it was created. For example, where an ambiguity is present in a Guideline promulgated by the Commission, *Kisor v. Wilkie*, 588 U.S. 558 (2019), an examining court might justifiably pause respecting its own interpretation of the ambiguous term. *See United States v. Mitchell*, 120 F.4th 1233, 1240-41 (4th Cir. 2024) ("[W]hile an unambiguous Guideline 'means what it means,' such that 'we have no need to consider' commentary when a Guideline is unambiguous, and cannot defer to it, that does not mean 'concrete' examples of how that unambiguous Guideline applies are unhelpful . . . .") (cleaned up).

This is why, apart from raising other concerns, the Eighth Circuit approach mentioned earlier cannot here be applied. Foremost, it fails to account for the statutory text and its context, along with paying insufficient heed to the concept of deference. In view of the unusual meaning by which the Commission drafted Guideline § 5C1.2, however, one must inquire whether an entirely different deferential scheme applies thereto.

As noted, we are dealing not with a Guideline drafted by the Commission in the customary sense. Instead, Guideline § 5C1.2 is simply § 3553(f) pasted into the Guidelines -- with the Commission textually admitting as much. And countless defendants are subject to its provisions year in and year out. And, having cut and pasted the statute, the Commission purported to define the statutory term "offense," which was left undefined by Congress, by way of Guideline Commentary.

14

The question thus may be whether that unusual approach implicates not the customary Guideline-deference rubrics applied over the decades, from *Stinson v. United States*, 508 U.S. 36 (1993), through *Kisor*, but rather the *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), approach applicable to statutory enactments interpreted by agencies such as the Commission. *See*, *e.g.*, *United States v. Boler*, 115 F.4th 316, 322 (4th Cir. 2024) ("Since *Loper Bright* dealt specifically with ambiguities in statutory directives to agencies and did not address the issue of agency interpretations of their own regulations, we will apply the Supreme Court's recent guidance in *Kisor* to address the issue before us today.").

If *Loper-Bright* applies in this instance, the analysis proceeds in a different manner when attempting to properly define the "statutory" term "offense:"

> In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion. Congress has often enacted such statutes. For example, some statutes "expressly delegate[]" to an agency the authority to give meaning to a particular statutory term. *Batterton* v. *Francis*, 432 U. S. 416, 425 (1977). Others empower an agency to prescribe rules to "fill up the details" of a statutory scheme, *Wayman* v. *Southard*, 23 U.S. 1, 10 Wheat. 1, 43, 6 L. Ed. 253 (1825), or to regulate subject to the limits imposed by a term or phrase that "leaves agencies with flexibility," *Michigan v. EPA*, 576 U. S. 743, 752, (2015), such as "appropriate" or "reasonable."

> When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits.

*Id*. at 394-395 (cleaned up). In overruling *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *Loper Bright* further observed as follows:

> Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires. Careful attention to the judgment of the Executive Branch may help inform that inquiry. And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it. But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.

*Id.* at 413. Our Court of Appeals, albeit not in the context of the Commission, has offered some guidance in conducting the analysis: "If a statute is ambiguous, courts 'exercise their independent judgment' to determine the 'single, best meaning,' but do so 'with the agency's 'body of experience and informed judgment' . . . at [their] disposal." *Valladares v. Ray*, 130 F.4th 74, 83–84 (4th Cir. 2025) (quoting *Loper Bright Enters.*, 603 U.S. 369, 400, 402, 412) (cleaned up)). One need look no further than *Loper Bright* to ascertain the reason for this sea change that scrubbed *Chevron* from the books: "[A]gencies have no special competence in resolving statutory ambiguities. Courts do." *Loper Bright,* 603 U.S. at 400–01.

For ease of consideration and application, it is helpful to sum up the *Loper Bright* and *Kisor/Auer* approaches as follows:

1. *Loper Bright* applies when a court is reviewing an agency's interpretation of a statute;

2. *Kisor* applies when a court is interpreting an agency's own rule or regulation;

3. Under *Loper Bright*, an agency's attempt at statutory interpretation is entitled to no deference. A court interprets the statute independently, using its well-developed maxims for statutory interpretation;

   a. The court may under some conditions afford appropriate respect to an agency interpretation inasmuch as "the contemporary and consistent views of a coordinate branch of government can provide evidence of the law's meaning . . . ." *Bondi v. VanDerStok*, 145 S. Ct. 857, 874 (2025). It may do so to the extent that interpretation has the "'power to persuade,'" *Garten Trucking LC v. Nat'l Lab. Rels. Bd.*, 139 F.4th 269, 276 (4th Cir. 2025) (quoting *Loper Bright*, 603 U.S. at 387-88, 393 n.4); *Chavez v. Bondi*, 134 F.4th 207, 221 (4th Cir. 2025) ("The Supreme Court in *Loper Bright* may have instructed us to review agency interpretation with a keener eye, but it didn't write off respect for settled, consistent, and persuasive precedents.");

4. Under *Kisor,* deference is limited and only warranted if strict conditions are met, as follows:

   a. The regulation must be genuinely ambiguous, even after the court has exhausted all traditional tools of interpretation (*e.g.*, text, structure, purpose, and history);

   b. If the regulation can be reasonably interpreted by the court, the inquiry ends;

c. Alternatively, only after resort to the traditional interpretive tools, deference is considered if "the agency's reading . . . fall[s] 'within the bounds of reasonable interpretation,'" where "the agency's interpretation of its regulation" falls "within the zone of ambiguity" created by the ambiguous text of the regulation." *United States v. Boler*, 115 F.4th 316, 323 (4th Cir. 2024) (cleaned up);

d. Even so, "not every reasonable agency reading of a genuinely ambiguous rule should receive" deference. *Id.* at 323. There must instead be a further, "independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* Some markers thereof according to *Boler* are as follows:

   i. Whether the interpretation is the "official position" of the agency;

   ii. Whether the agency's interpretation implicates its substantive expertise in some way (it must); and

   iii. Whether the agency's reading of the subject rule reflect its fair and considered judgment.

The analysis thus proceeds according to this multifocal lens, commencing in both instances with the determination of whether the word "offense" is ambiguous.

### III.

### A.    *The Proper Interpretation of the Statutory Safety Valve*

To revisit the inquiry in this particular case, the Court must decide whether Mr. Legrand is entitled to a two-level downward adjustment. That determination hinges on how the Court interprets the term "offense," namely, whether the term encompasses only Mr. Legrand's offense of conviction or, instead, the broader realm of relevant conduct that included his apparent pattern of distributing controlled substances with the aid and comfort of illegal firearms.

As noted, the inquiry is complicated by the fact that we do not have an agency in the usual sense publishing its interpretation of a statutory term. The Commission, instead, simply laid the statute within its own book, the Guidelines, and then offered its interpretation of a term

17

Congress left undefined. The Court is thus confronted with a bit of a hybrid situation arguably not contemplated by either *Loper Bright* or *Kisor*. In any event, the Court need not choose between the *Loper Bright* and *Kisor* approaches. Inasmuch as the *Loper Bright* approach is less deferential to the Commission than the *Kisor* approach, the inquiry practically ends if the *Loper Bright* result aligns with the Commission's approach.

The analysis thus starts with the statutory text. Congress expresses its intentions through statutory text passed by both Houses and signed by the President (or passed over a Presidential veto). The text controls over purported legislative intentions unmoored from any statutory text. The Court may not "replace the actual text with speculation as to Congress' intent." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496–97 (2022) (quoting *Magwood v. Patterson*, 561 U.S. 320, 334 (2010)); *id.* (noting further "the legislature says what it means and means what it says") (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 137 S. Ct. 1718, 1725, 198 L.Ed.2d 177 (2017)) (internal quotation marks and alterations omitted).

As noted earlier, however, a textual analysis and traditional interpretive tools rather quickly become mired in the competing definitions of the word "offense" earlier discussed. Given the shift in meaning of "offense" in the pre-Guidelines, 1984 era and the post-Guidelines, 1994 era, it is difficult to ascribe a uniform meaning to the word "offense" in the multiple appearances of the word in the 1984 CCCA version of § 3553 and the many others that were added a decade later by the 1994 VCCLEA in that same statutory section. It is thus doubtless the case that the word "offense --" even within the confines of § 3553 -- is patently susceptible to two different and reasonable meanings. The term is thus properly characterized as ambiguous, and there is no clear path forward for a strictly textual solution.

18

Turning to the history of 18 U.S.C. § 3553(f), the measure appears to have originated in a bill introduced by then Representative, and now Senator, Charles E. Schumer on March 8, 1994.  H.R. 3981, 103d Cong. (1994) (introduced Mar. 8, 1994). The Crime and Criminal Justice Subcommittee approved the bill 8-5 on March 11, 1994.  CQ Press, CQ Almanac 1994: *Lawmakers Enact $30.2 Billion Anti-Crime Bill*, at 5 (1994). The full committee approved it by a vote of 26-9 on March 16, 1994. *Id.* For present purposes at least, no material, substantive changes were made to HR 3981 between its introduction by then-Representative Schumer in the House of Representatives and, months later, President Clinton's signature. The sponsor's views thus ought to receive at least some consideration.

Then-Representative Schumer's views on the necessity of the Safety Valve appear in a letter he and six colleagues sent to then-Attorney General Janet Reno in June 1994, amidst ongoing negotiations on the 1994 crime bill. The letter provides pertinently as follows:

> Moreover, the same policy considerations that underly the safety valve's prospective application--*to ensure that our limited and costly prison space is not taken up by low-level non-violent drug offenders with no significant criminal history who do not belong there*--apply with equal force to similarly situated individuals already in prison.

Cong. Rec. S7 (daily ed. Aug. 19, 1994) (letter from House of Representatives members to Attorney General Reno explaining the retrospective and prospective application of the 'safety valve'") (emphasis added).

It thus seems apparent Congress enacted the statutory Safety Valve within the 1994 VCCLEA in an attempt to soften the most extreme impacts of mandatory sentencing, albeit without dismantling the overall structure of tough drug penalties. It is thus perfectly sensible that Congress embraced the concept of relevant conduct when doing so. Simply put, Congress would not have desired to provide a reduction to one who, as here, pled to an offense that did not involve a firearm

but who nevertheless was involved in serial drug dealing with multiple weapons at the ready. The only way to capture that additional, very serious misconduct for Safety Valve analysis would be to look beyond the offense of conviction to the much broader frame of reference found within the Guidelines' concept of relevant conduct. The minimal legislative history attached to the Safety Valve, then, appears to confirm that Congress in 1994 desired the sentencer to go beyond the offense of conviction and look deeply into the criminal history of the defendant and the entirety of his or her criminal misconduct. It was contemplated that only low-level, non-violent drug offenders with no significant criminal history ought to qualify for relief.

Having concluded the analysis, the Court pauses to consider the contemporary and consistent views and actions of the Commission to ascertain whether those views and actions have the power to persuade. They do. First, § 80001(b) of the session law, as noted, commanded the Commission to act and "promulgate guidelines, or amendments to guidelines, to carry out the purposes of" the Safety Valve, along with "policy statements, or amendments to policy statements." The Commission did precisely that, requiring that relevant conduct be included within the definition of the word "offense." The timing and substance of that Commission action is noteworthy. The 1994 VCCLEA was signed into law by President Clinton on September 13, 1994. The Commission promulgated Emergency Amendment 505 just seven weeks later, implementing the Safety Valve through § 5C1.2 of the Guidelines. In the past 30 years, Congress has taken no action to cabin the word "offense" with a narrower meaning. In fact, it has done just the opposite, expanding application of the Safety Valve most recently with the First Step Act of 2018, Pub. L. No. 115–391, 132 Stat. 5194 (2018).

Inasmuch as the traditional tools of statutory interpretation employed by the Court yield the same result as the time-tested interpretation of the Commission, the word "offense," as it

appears in both 18 U.S.C. § 3553(f)(2) and Guideline § 5C1.2(a)(1) means the offense of conviction and all relevant conduct.

**B.    *Application to Mr. Legrand***

It is incumbent upon Mr. Legrand to "prove 'by a preponderance of the evidence' that the firearm was not connected with the offense" in order to satisfy § 5C1.2(a)(2). *United States v. Bolton*, 858 F.3d 905, 914 (4th Cir. 2017).

Over the course of 11 days, Mr. Legrand in three separate transactions sold 16.289 grams of fentanyl. His merchandising in controlled substances was so profound it resulted in a search warrant of his home, where his bedroom yielded not only drugs but the two firearms as well. Mr. Legrand expressed the firearms were "for protection . . . everybody needs protection, and everybody has a right to bear arms. If I have the right to bear arms, I'm going to bear arms." [ECF 54 at 2]. The firearms located at his home base, along with the same type of controlled substances he was dealing in days and weeks preceding, plainly had the purpose or effect of protecting him and his illegal supply and, moreover, emboldening him in his illegal activities.

Additionally, an assessment of the location and the type of firearms work against Mr. Legrand. The firearms were found in his bedroom among illegal drugs, magazines, assorted ammunition, body armor, two cell phones, and $2,505. The firearms were a tactical shotgun and a .38 caliber firearm. These two types of firearms present in Mr. Legrand's bedroom alongside illegal drugs is sufficient to establish Mr. Legrand was utilizing those guns to facilitate trafficking drugs.

After examining the entirety of the relevant conduct in this case, Mr. Legrand has utterly failed to prove, by a preponderance of the evidence, the two firearms were not connected to his offenses. He is not entitled to the requested Safety Valve reduction.

## IV.

Accordingly, the Court **OVERRULES** Mr. Legrand's objection and **FINDS** a two-level downward adjustment under the statutory Safety Valve, 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, is not appropriate.

The Clerk is directed to send a copy of this written opinion and order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER:  July 7, 2025

Frank W. Volk
Chief United States District Judge

22